I. V. EWING, Safety Federal Savings and Loan Association, a corporation, H. Ben McCoy, Robert D. Adams Plumbing & Heating Company, a corporation, and One Hundred Two Glenstone, Inc., a corporation, Plaintiffs-Respondents,

v.

The CITY OF SPRINGFIELD, Missouri, a municipal corporation, Defendant-Appellant.

No. 8804.

Springfield Court of Appeals, Missouri.

Jan. 2, 1970.

Don G. Busch, Springfield, for defendant-appellant.

F. B. Freeman, Thom G. Field, Neale, Newman, Bradshaw & Freeman, Springfield, for plaintiffs-respondents.

HOGAN, Judge.

This is a declaratory judgment action in which plaintiffs, as owners of several contiguous tracts in Springfield, sought to have the City's general zoning ordinance declared invalid as to the land described in the petition on the ground that it was unreasonable, arbitrary and confiscatory as so applied. The trial court found for the plaintiffs, and the City has appealed.

■ We have had first to examine the question of our jurisdiction. The City assures us, without citation of authority, that the case involves only the application, not the construction, of constitutional provisions; the plaintiffs assert as positively that a live constitutional question is presented for decision. In this instance, the value of the relief sought is not shown to be in excess of our jurisdictional amount, as was the case in Huttig v. City of Richmond Heights, Mo., 372 S.W.2d 833, and Wrigley Properties, Inc. v. City of Ladue, Mo., 369 S.W.2d 397. The plaintiffs had evidence that the property involved would be worth more if it were rezoned, but they did not undertake to prove how much its value would be increased. For the original appellate jurisdiction of the Supreme Court to attach because of the amount in dispute, the record must show affirmatively and with certainty that the amount in dispute or value of the relief sought exceeds $15,000, exclusive of costs. Superior Concrete Accessories v. Kemper, Mo., 284 S.W. 2d 482, 485 [1, 2]; Sanderson v. Richardson, Mo.App., 432 S.W.2d 625, 627–628 [2]. If this court lacks jurisdiction, it is because a " * * * construction of the Constitution of the United States or of this state * * *" is required within the intendment of Mo.Const. art. 5, § 3 (1945).

No doubt in a very general sense constitutional principles are involved in this case. It is well established that a valid general zoning ordinance may be so arbitrary and unreasonable in its application to a particular tract as to tend toward confiscation, and when that is true the ordinance infringes the rights of the owners under the due process provisions of both the federal and state constitutions. Women's Kansas City St. Andrew Society v. Kansas City, Mo., 8 Cir., 58 F.2d 593, 599; Huttig v. City of Richmond Heights, supra, 372 S.W.2d at 843 [8]. Nevertheless, this court is not called on to "construe," that is, to "determine the meaning and proper effect"[1] of either U.S.Const. amend. XIV, § 1, or Mo.Const. art. 1, § 10. Whether or not the plaintiffs' constitutional rights have been infringed in this case is essentially a question of fact. Landau v. Levin, 358 Mo. 77, 80–81, 213 S.W.2d 483, 484 [1]; Taylor v. Schlemmer, 353 Mo. 687, 696, 183 S.W.2d 913, 916 [3]. Otherwise put, the "constitutional issue" presented is really nothing more than a contention that the zoning law has been incorrectly applied by the City, and we have jurisdiction of the appeal. Wrigley Properties, Inc. v. City of Ladue, supra, 369 S.W.2d at 397–398 [1].

Several factual aspects of the case should be preliminarily noted. In the first place, the plaintiffs are the owners of five separate but contiguous tracts of land which front on Sunshine Street in south Springfield. These individual tracts vary in size, and they were not, at trial time, uniformly zoned. The individual tracts were zoned R–3 (multi-family) to a depth (north and south) of 200 feet, but the parts of the plaintiffs' individual tracts extending beyond that depth were zoned R–1 (single family), and in one case partially R–1 and partially R–2 (two-family). Plaintiffs— and the City makes a considerable point of

this—did not seek to have all their property rezoned, but in their petition described a tract of land 200 feet deep (north and south) and 757.5 feet long (east and west) squarely off the north side of the five separate individual tracts. This strip, to which we shall refer as the tract in suit or the subject property, fronts on the south side of Sunshine, beginning at the southeast corner of Sunshine and Pickwick Avenue, and running, as we have said, 757.5 feet east along the south side of the street.

The general area in question is that part of the City south of Sunshine (which runs east and west) between its intersections with National Avenue on the west and Glenstone Avenue on the east. Several maps and sketches of this general area were introduced in evidence. We have carefully examined these exhibits, but we shall not discuss them in detail beyond saying that one, the City's Exhibit 7, is obviously a district zoning map, though it is not so denominated. It is drawn to scale, and it very clearly shows the general layout of the property in the area, along with the zoning classification of each tract. It shows, among other things, that between its intersection with National Avenue on the west and Glenstone Avenue on the east, Sunshine is intersected by four north-south streets on the north side, and four north-south streets on the south; however, with the exception of Fremont Street, the intersections are not even generally aligned, and the only street which crosses Sunshine between the two intersections is Fremont.

As a further preliminary, it should be noted that the contest here is between classification as R–3, for which the City contends, and C–2, for which the plaintiffs argue. R–3 is designated "multi-family" in the general zoning ordinance, but it is not a strictly residential classification; this part of the ordinance contem-

---

1. That such is a definition of "construction" in the sense here involved, see E. B. Jones Motor Co. v. Industrial Commission, Mo., 298 S.W.2d 407, 410 [4, 5];

Dorrance v. Dorrance, 242 Mo. 625, 644–645, 148 S.W. 94, 98; City of Olivette v. Graeler, Mo.App., 329 S.W.2d 275, 279.

plates uses which involve the employment or occupancy of land by relatively large numbers of people. Uses permitted as of right include boarding houses, apartment houses, hospitals (subject to some limitation), clubs and recreational buildings. Subject to the issuance of a "use permit," office buildings are authorized. The R–3 category, however, excludes commercial usage; "incidental" businesses may be conducted in apartment houses, but window displays or advertisements are generally forbidden, and while clubs or recreational facilities may be constructed, that may be done only "provided any such use is not for commercial gain." Office buildings may be constructed upon the issuance of a use permit, but the issuance of such a permit is conditioned upon a finding by the zoning authority that no inventory of merchandise will be maintained on the premises for sale at wholesale or retail. Moreover, the lot coverage provisions restrict the use of property considerably by limiting the combined area of the main and accessory buildings to 40 per cent of the total area of the lot. The C–2 classification, on the other hand, contemplates use as a retail sales district. Forty-eight uses are permitted as of right, in addition to the 14 permitted as of right in the R–3 classification, the general limitation being that no manufacture, compounding or processing may be carried on in a C–2 district, except such as is clearly incidental to a permitted use. In the C–2 category the lot coverage restrictions apply only to structures used as dwellings.

With these preliminary matters noted, we may consider the general factual background of the case. Sunshine has for many years been a major route of travel for east-west traffic, but in recent years, and since the enactment of the general zoning ordinance, it has been widened and the volume of traffic has greatly increased. Sunshine is 62 feet wide at the point involved here. There are two twelve-foot driving lanes on either side for through traffic, and between the outside driving lanes there is a fourteen-foot painted median lane which is used primarily as an alternate turn lane for left-turning traffic. Except at the intersection of Fremont and Sunshine, some 336 feet west of the west line of the subject property, there is direct access to all abutting properties. Sunshine is part of U. S. Highways 60 and 65, and Missouri Highway 160, and is so designated. Approximately 1550 feet east of the east line of the subject property, Sunshine intersects Glenstone at right angles. The record indicates that this is the busiest intersection in the City. Traffic counts made some two and one-half years before the trial indicated that the volume of traffic through the intersection varied from 12,022 to 27,050 vehicles per day, depending on the approach at which the traffic was measured. Several witnesses testified that the volume of traffic at the intersection and to the west on Sunshine is increasing rapidly.

In the subject tract itself, beginning on the west at the intersection of Sunshine and Pickwick, there are: a federal savings and loan bank (constructed after the commencement of this litigation upon the issuance of a "use permit"), an insurance office, an office building, and two residences. Immediately east of the subject property, there is a multi-specialty medical clinic operated by a group of physicians. From there east to the intersection of Sunshine and Glenstone—some 1300 feet —the south side of Sunshine is zoned C–2 to a depth varying from 250 to 600 feet. In this strip, there are: four residences, a flower shop, a dentist's office, a fabric shop, an optician's office, a knit shop, a combination barber and beauty center, a piano sales agency, a paint store, an interior decorating shop, another beauty shop, a self-service laundry, a bicycle sales and repair shop, a "music store," and an office building. It is stipulated by the City that 490 feet of this 1300 feet of C–2 frontage represents a rezoning from R–3 by ordinance on January 16, 1967.

To the west of the tract in suit, the property on the south side of Sunshine is

zoned C–2 for approximately 1300 feet. Uses along this strip include: a Kentucky Fried Chicken franchise sales, a dry cleaning shop, a sales office for electric organs, another dry cleaner, a hamburger stand, a real estate office, a bakery, a sandwich shop, another barber and beauty center, a commercial garage, another dry cleaning shop, a grocery store, a self-service car wash, a drive-in hamburger stand, and a gasoline service station. Of this frontage to the west of the subject property, as we understand the record, 386 feet represents rezoning from R–1 and R–3 since the enactment of the general zoning ordinance.

South of the subject property, there is a residential district which consists of one small platted subdivision and parts of two others. The residential area abuts and is contiguous with the tract in suit on the south, but it is obvious from the maps filed that there is no regular pedestrian or vehicular access to the subject property from this residential property. South of Sunshine and east of Pickwick Avenue (the west line of the subject property) none of the north-south streets intersect Sunshine for a distance of some 1475 feet; in fact, the nearest residential street to the south describes a semi-circle south of the south line of Sunshine, and some 150 feet south of the south line of the tract in suit. The remaining four north-south streets immediately south of the subject property dead-end some 650 feet south of Sunshine. The arrangement of this residential property is somewhat difficult to depict concisely, but for practical purposes, the residential property may be regarded as simply lying on the periphery of the tract in suit, without direct access thereto.

The plaintiffs had the testimony of several witnesses of varying degrees of expertise; as might be expected, there was a good deal of discussion concerning their qualifications as experts, but in general they were familiar with real estate uses and values in the community and with the tract in suit and the property surrounding it. Summarizing it only very briefly, the plaintiffs' evidence was: That for a number of years, the character of the neighborhood had been gradually changing from a residential to a commercial neighborhood, and in recent years this change had been taking place rapidly; that because of the heavy volume of traffic on Sunshine and the unrestricted traffic pattern permitting access to all abutting property, the subject property was suitable for use as commercial but not as residential or multi-family property; that the tract in suit was indistinguishable from that zoned C–2 on either side in all its features involved as considerations in zoning, such as topography, use of neighboring lands, traffic conditions, and other pertinent characteristics; that it would be uneconomic to use the tract in suit as residential or multi-family property, but its value would be considerably increased if it could be used for commercial purposes; and that the value of the residential property to the south of the subject tract would not be substantially affected by rezoning the tract in suit. Several of the plaintiffs' witnesses testified that, in their opinion, the highest and best use of the subject property would be use as commercial property. Their individual conceptions of the term "highest and best use" varied a good deal, but in general it was their opinion that "highest and best use" meant that which is productive of the most value and utility to the owner and the community.

The City introduced a number of exhibits, but it called only one witness, a Mr. Davidson, executive vice-president of the Safety Federal Savings and Loan Association. Mr. Davidson's testimony was that his bank, since the institution of the suit, had acquired the westernmost of the individual tracts involved—it is referred to as the Sawyer tract—and had built a building on that land for the conduct of its business. The officers of the bank had been aware that the property was zoned R–3 when it was purchased; they had applied for a "use permit" and it was

issued. The bank had "made its plans to fit" the restrictions of R–3 zoning, and was using its property in just the way it had planned. Mr. Davidson testified, incidentally, that in his opinion development of the subject property for multi-family use would be neither advisable nor practical.

As indicated, the trial court found for the plaintiffs. The court also filed a lengthy memorandum, which has been included in the transcript. We will not quote the memorandum at length, although it shows careful and thoughtful consideration of the various factual and legal propositions advanced by counsel after the case was submitted. In our view, the parties have over-complicated the case, and we shall consider only those essential matters necessary to a proper disposition of the appeal. See Bloomfield Reorganized School Dist. No. R–14 v. Stites, Mo., 336 S.W.2d 95, 97.

The City maintains at some length that there was no actual, justiciable controversy in this case, and therefore a declaratory judgment should have been denied. Likening this case to Flora Realty and Investment Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771, appeal dismissed 344 U.S. 802, 73 S.Ct. 41, 97 L.Ed. 626, and relying on the general principle that the Declaratory Judgments Act [Rule 87, V.A.M.R.; §§ 527.010–527.140, RSMo (1959).] does not contemplate nor authorize the issuance of advisory opinions on hypothetical facts or on some possible future transaction, Tietjens v. City of St. Louis, 359 Mo. 439, 442, 222 S.W.2d 70, 71 [1], the City argues that since none of the owners of the individual tracts involved had a specific plan for commercial use of his property, there is no present, actual controversy appropriate for judicial determination by declaratory judgment.

It is true enough that none of the owners of the individual tracts involved had a concrete, ascertained use in mind for his property, but the testimony, though general, indicates that the owners had a definite intention to use their lots for commercial purposes now forbidden by the general zoning ordinance. Moreover, as the City admitted in its answer, the plaintiffs, with the exception of Safety Federal Savings and Loan, had applied for a rezoning of the subject property, and their application had been denied. The distinction between a case appropriate for judicial determination by declaratory judgment and a hypothetical or abstract difference or dispute is essentially one of degree, Nations v. Ramsey, Mo.App., 387 S.W.2d 276, 280 [11], and we do not consider the plaintiffs' position in this case to be similar to that of the plaintiff in the *Flora Realty and Investment* case. In the *Flora* case, Section 8 of the Ladue ordinance provided for variances upon application, but the plaintiff had not tried to avail itself of the provisions of Section 8, and apparently had not indicated even generally that it desired or intended to use its property for institutional purposes. In our case, the plaintiffs have applied for a rezoning and have been refused, and their testimony indicates a specific intention to use their property for purposes now forbidden by the ordinance. Conditioning the plaintiffs' right to maintain this action upon their entering into some specific business transaction to be held in abeyance pending action by the courts would be, in our view, unreasonable. Here, the plaintiffs, with the exception of Safety Federal, have asserted that the general ordinance arbitrarily and unreasonably restricts the use of their land to the point of confiscation; they have sought to have the restriction lifted. The City, by its refusal to rezone, has taken an adverse position with respect to the validity of the ordinance and the existing rights of the plaintiffs to use their land for commercial purposes. The case calls for an adjudication of present rights, not a hypothetical or advisory opinion. Exchange National Bank of Chicago v. County of Cook, 6 Ill.2d 419, 129 N.E.2d 1, 3 [3, 4]; Taylor v. Haverford Township, 299 Pa. 402, 149 A. 639, 642 [6].

The position of Safety Federal Savings and Loan is different from that of the other plaintiffs. It bought its property after suit was filed with knowledge that it was zoned R–3. Thereafter, Safety Federal applied for a permit to conduct its business on its individual tract, drew its building plans to conform to the requirements of the general zoning ordinance, and was granted the permit. The building was completed, and Safety Federal is now conducting its business there. It has no other plans in mind for its property, and it does not contend that the conditions of its use permit are unreasonable. In general, one who voluntarily proceeds under a statute or ordinance and accepts benefits thereby conferred will not be heard to question its validity in order to avoid its burdens, St. Louis Public Service Company v. City of St. Louis, Mo., 302 S.W.2d 875, 879–881, and with certain exceptions not applicable to Safety Federal, that rule obtains in zoning cases. Women's Kansas City St. Andrew Society v. Kansas City, Mo., supra, 58 F.2d at 606; 101 C.J.S. Zoning, § 21, p. 721. Having voluntarily proceeded under the general zoning ordinance, and having accepted benefits thereunder, Safety Federal is not now in a position to challenge its constitutionality. Bringle v. Board of Supervisors of County of Orange, 4 Cal.Rptr. 493, 496, 351 P.2d 765, 768 [10]; Heady v. Zoning Board of Appeals, 139 Conn. 463, 94 A.2d 789, 791–792 [6]; Convent of Sisters, etc. v. City of Winston-Salem, 243 N.C. 316, 90 S.E. 2d 879, 884–886 [2] [3]. We realize that Safety Federal's inconsistent position, or estoppel, developed after the suit was filed, but declaratory relief should be complete, Mayor, Councilmen, etc. v. Dealers Transport Co., Mo., 343 S.W.2d 40, 43 [3], and for that reason we believe the rights of the parties should have been determined in this case as of the time they were declared.

It is argued by the City that the plaintiffs had no right to ask for rezoning of only *part* of the land they owned. With deference to able and articulate counsel for the City, we find this argument difficult to follow. The individual lots owned by the plaintiffs were not uniformly zoned to start with; one of the lots in question here was zoned partly R–3 and partly R–1; another was zoned in three different categories. It is considered desirable, though not necessary, to have the zoning run to a uniform depth, 1 Rathkopf, Zoning and Planning, p. 13–2 (3rd ed.), and to extend the depth of the rezoning here sought to the south property line would surround some of the residential lots to the south with C–2 uses. Nevertheless, we should point out that the City does not argue that a rezoning following the boundaries sought by the plaintiffs would have any particular undesirable consequence, such as isolating or "landlocking" the plaintiffs' remaining property; its argument is simply that plaintiffs have no right to ask that part of their property be rezoned. Reduced to essentials, the City's position is that zoning boundaries must coincide with property lines to be reasonable. In our view, a zoning boundary cannot be said to be either reasonable or unreasonable simply because it does not follow the property line. Such authority as we have found supports that view. See, e. g., Helms v. City of Charlotte, 255 N.C. 647, 122 S.E.2d 817, 821–822 [7], and Ciaffone v. Community Shopping Corp., 195 Va. 41, 77 S.E.2d 817, 823 [11]. There is no merit in this contention.

Finally, the City argues that the record does not support the finding of the trial court. It is argued that there is a distinction between the discriminatory, the arbitrary and capricious, and the confiscatory elements of an invalid zoning restriction, and the City maintains that each such quality must be clearly demonstrated. While we agree that the word "confiscatory" is a strong term, it is not necessary to consider separately the several aspects of an invalid zoning regulation, nor to reiterate general principles at length, nor to dis-

cuss the various peripheral issues which have been tendered. Like an original zoning, a refusal to rezone property from residential to business use may be arbitrary and unreasonable, Wrigley Properties, Inc. v. City of Ladue, supra, 369 S.W.2d at 400 [2–4]; 101 C.J.S. Zoning, § 97, p. 851, but each case must be individually considered and no single factor is decisive or controlling. Huttig v. City of Richmond Heights, supra, 372 S.W.2d at 842 [7]; Fairmont Investment Co. v. Woermann, 357 Mo. 625, 630–631, 210 S.W.2d 26, 29 [2].

A decision on the merits in this case must take into account the distinct and particular location of the tract in suit with respect to the adjoining streets and abutting property. As already stated, Sunshine is not crossed by any intersecting streets between its intersection with Fremont on the west and Glenstone on the east. The arrangement of the north-south streets to the south of Sunshine is such that there is no regular pedestrian access to the tract in suit from the residential area to the south, and vehicular access from that residential area to the subject property is circuitous and inconvenient. Sunshine in front (north) of the tract in suit is 64 feet wide and carries the traffic of two federal highways and one state highway. The traffic pattern is not controlled; vehicles traveling in either direction may turn left squarely against oncoming traffic. Sunshine does not merely divide the area to the north and that to the south; it is actually a formidable barrier between the two. Therefore, for practical purposes, the subject property must be considered in relation to the property east and west of it on the south side of Sunshine. It is wholly unlike the buffer area considered in Downing v. City of Joplin, Mo., 312 S.W.2d 81.

As shown by plaintiffs' Exhibits 1, 2, 7 and 10, the general accuracy of which is admitted, the City has, by three separate amendments to the general ordinance, reclassified 876 feet of frontage on the south side of Sunshine from R–1 (single family) and R–3 (multi-family) to C–2, the classification sought by the plaintiffs. The property so rezoned lies on either side of the tract in suit, and there was persuasive testimony that the rezoned property is not distinguishable, physically or otherwise, from the subject tract. The net result is that for approximately 1300 feet on either side of the tract in suit, similarly situated and indistinguishable property is zoned C–2, while plaintiffs' land is zoned R–3. We agree with the plaintiffs that this piecemeal zoning has made a "spot" or "island" of their land by putting it in a zoning category more restricted than that of their neighbors. This constitutes a species of "spot" zoning. Anno., 51 A.L.R. 2d 263, § 1, p. 265; § 17 [a], pp. 311–315; 8 McQuillin, Municipal Corporations, § 25.83, pp. 223–227 (Rev. 3rd ed., 1965). Such restrictive classification is obviously discriminatory, for the use of plaintiffs' land is much more limited than is that of similarly situated landowners to the east and west of them on Sunshine. However, "island" or "spot" zoning is not necessarily invalid. State ex rel. Christopher v. Matthews, 362 Mo. 242, 247, 240 S.W.2d 934, 937 [1, 2]; Anno., supra, 51 A.L.R.2d 263, § 4 [a], pp. 273–274; 8 McQuillin, Municipal Corporations, § 25.84, pp. 230–235. The circumstances must be further considered.

There are a number of factors to be given due consideration in determining whether or not the zoning restriction complained of is reasonable. They have been variously stated, but in general they are: The use to which nearby property is put, and the authorized land usage or zoning of nearby property; the hardship imposed on the complaining landowner and the extent to which the value of his property is diminished; the effect which removal of the restriction would have on the value of other property in the area; and the relative gain to the public as compared to the hard-

ship imposed on the property owner.[2] We have considered each of these factors separately in this case, bearing in mind that no single consideration is controlling or decisive.

As the trial court found, and as we noted in detail in our background statement, of the 36 separate uses of property in the 3611-foot strip on the south side of Sunshine west from its intersection with Glenstone, 17 are already C–2 uses, six are C–1 uses, seven are under a so-called "use permit," and six are residential uses. Four of the residential uses are in areas already zoned C–2. Seventy-two per cent of the strip along the south side of Sunshine is already zoned C–2. We find, as did the trial court, that the area to be considered is basically commercial; the zoning restriction of which the plaintiffs complain is not consonant with surrounding existing uses or the zoning or authorized uses of similar nearby property.

Another factor to be considered is whether or not the zoning restriction has worked a financial hardship on the landowner or has caused the value of his property to diminish. Huttig v. City of Richmond Heights, supra, 372 S.W.2d at 840 [3]; Robertson v. City of Salem, supra, 191 F.Supp. at 609; 101 C.J.S. Zoning, § 72, pp. 813–814. The trial court noted in its memorandum that plaintiffs' proof of diminished value fell short of establishing that they had suffered a unique hardship or complete loss of use of their property, and we agree; their witnesses testified that the subject property would be worth more if it were zoned C–2, but they did not say how much. There was, however, testimony from two witnesses, Ewing and McCoy, that they had lost or had been unable to accept profitable business proposals because of the restriction on the use of their land. There was other testimony from plaintiffs' witnesses indicating that the

tract in suit was not readily saleable or subject to development as multi-family property, but that it could be sold or developed as commercial property. If the proof of diminution in value is not as strong as that developed in the *Huttig* case, there is nevertheless substantial evidence that the zoning restriction has worked an appreciable financial hardship on the plaintiffs.

A further consideration is whether or not the rezoning sought would have an adverse effect on the value of other property in the area. The plaintiffs' witnesses testified that rezoning the tract in suit from R–3 to C–2 would have no harmful effect on the residential property to the south of Sunshine, and we find their evidence convincing, considering the peculiar layout of the residential area.

Finally, we must consider the relative gain to the public as compared to the hardship imposed on the individual owners by retention of the zoning restriction. Huttig v. City of Richmond Heights, supra, 372 S.W.2d at 842 [5]. Whatever the source of the City's zoning power in this case, the public purposes to be accomplished by zoning regulations are set out in the Enabling Act. §§ 89.010–89.140, R.S.Mo. (1959); Strandberg v. Kansas City, Mo., 415 S.W.2d 737, 743–744; Ryan v. City of Warrensburg, 342 Mo. 761, 769, 117 S.W.2d 303, 306 [3]. Zoning regulations should, among other things, operate: to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and general welfare; to prevent the overcrowding of land and avoid undue concentration of population; and to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. § 89.040, R.S.Mo. (1959). Upon careful consideration, we are unable to see that retention of the present zoning classification serves any of these public purposes suf-

2. See § 89.040, R.S.Mo. (1959); Sinclair Refining Co. v. City of Chicago, 7 Cir., 178 F.2d 214, 217 [5]; Robertson v. City of Salem, D.Or., 191 F.Supp. 604, 609 [11]; Krom v. City of Elmhurst, 8 Ill.2d 104, 133 N.E.2d 1, 3 [2]; 8 McQuillin, Municipal Corporations, § 25.45, p. 117.

ficiently to outweigh its unreasonable aspects. By zoning the subject property R–3, and through the issuance of use permits, the City has consistently approved uses of land in this zoning district which involve quite as much hazard to the public interest as do the uses contemplated by the plaintiffs. Some additional traffic would doubtless be generated by the establishment of commercial shops, but we are convinced that here, as in the *Huttig* case, most of the volume of traffic is through traffic, not originating in the neighborhood, and that the traffic congestion caused by a change to C–2 use would be relatively insignificant, when compared to the existing amount of traffic and congestion. In any event, the relative increase would probably be no greater if a small store were established than it would be if the land is used as a location for apartment houses or office buildings, with their attendant parking facilities. Likewise, there may be some accumulation of waste material, and some consequent danger to public health inherent in the operation of some commercial enterprises, but the same thing is true of any building in which relatively large numbers of people live or work. We need not make comparisons or draw parallels at length; it is sufficient to say that in our opinion, in the circumstances presented, retention of the present zoning restrictions bears no substantial relation to the public health, safety or general welfare.

For all the reasons stated, we find and hold that, upon the facts and circumstances presented by the record, the present zoning classification of the subject property is discriminatory, arbitrary and unreasonable as to all the plaintiffs except Safety Federal Savings and Loan Association. We further find that the present zoning restriction, with the exception noted, is without substantial relation to the public health, safety or general welfare, and that the proposition is not fairly debatable. The restriction is therefore invalid, and present General Ordinance No. 1114 of the City of Springfield, Missouri, as amended, is void as applied to the tract in suit, again with the exception noted. The cause is remanded for entry of a judgment declaring the rights of the plaintiffs in accordance with this opinion, to be enforced by appropriate injunction, if necessary.

TITUS, P. J. and STONE, J., concur.