**Luther C. WHEELER and Ann Nell O'Hearn Wheeler, Plaintiffs-Appellants,**

v.

**CITY OF BERKELEY, a municipal corporation, et al., Defendants-Respondents.**

No. 34158.

Missouri Court of Appeals, St. Louis District, Division One.

Aug. 1, 1972.

Motion for Rehearing or for Transfer to Supreme Court Denied Oct. 10, 1972.

Application to Transfer Denied Nov. 13, 1972.

G. A. Buder, Jr., Richard O. Roberts, St. Louis, for appellants.

Louis S. Czech, Clayton, for respondent.

WEIER, Judge.

The plaintiffs, Luther C. Wheeler and his wife Ann, filed suit to have Ordinance No. 1057 adopted on April 21, 1958, by the City of Berkeley, Missouri, declared invalid as it applies to their property. This action was commenced after the City of Berkeley failed to act on the plaintiffs' request to change the zoning classification of the property from single-family dwelling to multiple-family dwelling.

The property involved is located at the southern edge of the City of Berkeley, off Carson Road. It is set back off the road some five hundred and seven feet and its access to the road is by means of a strip of land twelve and one-half feet wide, extend-

ing this distance. This is a gravel roadway which begins at the west edge of Carson Road, and passes between the north boundary of the Tamurai apartment complex and the south boundary of Penn Nursing Home. Penn Nursing Home preserves the integrity of its boundary by means of a chain link fence—the Tamurai apartment complex by means of a concrete retaining wall.

This gravel roadway continues through the Wheeler property and exits at the north boundary. On the land north of and adjacent to this boundary there are nine single-family residences laid out in somewhat of an "L" shaped pattern. The Mark Twain Highway, a four-lane interstate thoroughfare, to the north of these houses, blocks off any further vehicular access to the City of Berkeley. Like the Wheeler property, the area occupied by these residences is zoned single-family residential and the narrow roadway provides the sole means of access.

To the west of the Wheeler property is an old railroad right-of-way. It is described as being "sort of a deep cut." The west boundary which follows the railroad cut also divides the City of Berkeley and the Village of Bel Ridge. At what was described as "further than that" (the railroad right-of-way) is the subdivision known as Berry Meadows.

The Tamurai apartment complex constitutes the southern border of the Wheeler property. It is located in an unincorporated area of St. Louis County and thus is not subject to control by the City of Berkeley. The exhibits indicate that the complex is substantial in size and that the outward appearance is neat and orderly. Most significant is the fact that a roadway extends on the Tamurai property immediately adjacent and parallel to the south boundary of the Wheeler property and this roadway extends to Carson Road. The road has not been dedicated to public use, but is used solely by the apartment tenants. Thus, it cannot be used as a means of access to the Wheeler property without permission.

To the east, Penn Nursing Home lies between Carson Road and the Wheeler property. This is within the city limits of Berkeley, but is zoned for commercial purposes. The structures thereon are surrounded by a generous, well-kept lawn and bordered by a fence.

The Wheeler property itself has an area of approximately four and four-tenths acres. It is an irregular trapezium in shape, its northern and southern boundaries being 581.39 feet and 624.00 feet, respectively, and its eastern and western boundaries being 287.90 feet and 310.85 feet, respectively. The land is undeveloped and overgrown with brush and trees. There is no indication that the land contains any geographical features which would limit the possible uses of the property, if developed.

Motivation exists for seeking a change of zoning because of a sale contract entered into between the plaintiffs and Lambert Realty & Development Corporation (hereinafter called Lambert Realty) for the sale of the Wheeler property. Lambert Realty agreed to buy the land at a price of $6,000 per acre if the land was rezoned multiple dwelling, so that the Tamurai apartment complex might be extended onto it. Since Lambert Realty owned the Tamurai complex, the requirement of using the twelve and one-half foot right-of-way for access to the new development would be eliminated.

The testimony at the trial may be categorized into two major areas: 1) the problem of ingress and egress; and, 2) the advantages and disadvantages of zoning the property multiple-family dwelling or retaining the single-family residential status.

Concerning the first, the evidence disclosed the City of Berkeley municipal code, chapter 17.07, requires all streets installed after March 5, 1952, to have a minimum

width of twenty-six feet. The twelve and one-half foot right-of-way, of course, would not meet the standard, and this would preclude the development of the land as either a multiple-family complex or resubdividing it as a residential subdivision, with twenty to twenty-five lots. As previously stated, this disadvantage could be removed if Lambert Realty were to buy the property. The capacity of the plaintiffs themselves to eliminate this problem is unexplored in the record. What testimony there is concerning the attitude of the owner of Penn Nursing Home to allow his property to be used to widen the present easement is hearsay and, along with being unsubstantial, it is negative. Nothing is mentioned of the possibility (or impossibility) of obtaining access to the west through the Berry Meadows subdivision.

The evidence over the best use of the property was presented by expert witnesses produced by both sides. Mr. Dardick, an urban planner, testified on the plaintiffs' behalf. He believed "the most appropriate use for the subject site is multi-family development—specifically, the extension of the Tamurai apartment house development." His reasons were couched in terms of "community interests." He stated, "Our studies and other studies made by profes-sional planners have indicated * * * that multiple family do not cause fire problems as much as other developments." In regard to police calls, he again stated that multiple families are less trouble. Concerning the financial effect of the development on the city, he concluded that the city could make a tax profit of $1,930.00 on multiple-dwelling complexes, as opposed to sustaining a deficit of $4,450.00 on a residential subdivision with twenty new dwellings in the same area. The figures were derived from an interrelationship of an average number of children per family in each type of housing, the tax revenue from each category, and the cost of educating children within the Berkeley school system (which is not a burden on the municipal government). There is no indication in his

calculations that he considered significant the difference in revenue as it would bear upon the welfare of the community, and other relevant factors. This expert, as well as a builder and a financier, also admitted the problems and effect of nonaccess, irrespective of use. Mr. Dardick readily conceded that the land would not be suitable for multiple-family dwellings unless it had adequate access.

Defendant's experts consisted of the fire chief, a police officer and the building commissioner, all of the City of Berkeley. Their testimony indicated the necessity and frequency of calls for police and fire services are less for residential developments than for apartment complexes. Concern was expressed over the availability of water and the increase of traffic on Carson Road. The problem of access over the narrow roadway was also emphasized, particularly for emergency police and fire vehicles. The building commissioner admitted that present narrow access would preclude issuing building permits for either a resubdivision or a multi-family complex, but there was nothing prohibiting him from issuing permits to build single-family residences on those lots into which the Wheeler land had been subdivided prior to the institution of the Berkeley zoning regulation. Since this consisted of three separate lots, three building permits could be issued.

The trial court found that Ordinance No. 1057 of the City of Berkeley was valid, as it applied to the plaintiffs' property; the City had not acted arbitrarily or unreasonably and its actions in maintaining the existing zoning classification were fairly debatable. From that judgment, plaintiffs appealed to this court.

In examining the evidence, we are mindful of the fact that the duty to determine the use classification for any particular area rests with the governing legislative body. This court cannot disturb that judgment, unless we determine the zoning classification enacted is arbitrary or unreasonable. Duly enacted zoning ordinances are

presumed to be valid and those challenging the reasonableness of an ordinance, as applied to a specific property, have the burden of proving unreasonableness. If the legislative action is fairly debatable, it must be upheld as valid. These rules apply with equal force to rezoning and a refusal of an application to rezone. Vatterott v. City of Florissant, Mo., 462 S.W.2d 711, 713.

Consistently it has been emphasized that each case must be decided on its own particular facts and circumstances. Flora Realty & Inv. Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771, 778[4]. In Ewing v. City of Springfield, Mo.App., 449 S.W.2d 681, 689[16], the factors to be considered in passing on the validity of a zoning ordinance were summarized as: "The use to which nearby property is put, and the authorized land usage or zoning of nearby property; the hardship imposed on the complaining landowner and the extent to which the value of his property is diminished; the effect which removal of the restriction would have on the value of other property in the area; and the relative gain to the public as compared to the hardship imposed on the property owner." In Section 89.040, RSMo 1969, V.A.M.S., municipal legislative bodies are admonished: "Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout such municipality."

Before balancing these factors, the issue of how much weight, if any, should be given to the effect of limited access to the Wheeler property must be disposed of. Chapter 17.07 of the municipal code of Berkeley applies to new multi-family complexes as well as to new residential subdivisions. A twenty-six foot wide roadway must be provided before building permits will be issued for either use. However, plaintiffs assert that the subsequent purchase of their property by Lambert Realty would cause this defect, as it applies to a multi-family complex, to be cured. The plaintiffs' assertion cannot be accepted, for there is no guarantee that Lambert Realty will purchase the property if it should be re-classified as multiple-family residential. The sale contract and extension agreement in evidence terminated on March 21, 1970, and nothing else indicates a further obligation of Lambert Realty to purchase this land. Even if an enforceable agreement existed, fortuitous circumstances (i.e., bankruptcy or insolvency) could always intervene to prevent completion of the contract. Because of this necessary relationship between the Wheelers and Lambert Realty, this case can be distinguished from successful attempts at rezoning through the judicial process. In Huttig v. City of Richmond Heights, Mo., 372 S.W.2d 833, the court ordered a change of the classification of a tract of land from residential to commercial. However, once zoned commercial, the tract, which bordered a busy street in a commercial zone, could be appropriately used by the owner or offered for sale on the open market. In Ewing v. City of Springfield, supra, Mo.App., 449 S.W.2d 681, 690, the property, surrounded by land commercially zoned, would become readily saleable if rezoned.

The plaintiffs rely on Gavosto v. Town of Normandy, Mo.App., 452 S.W.2d 308, to support their proposition that the absence of adequate access "renders the subject property completely unsuitable as presently zoned." In that case the only access to the property was insufficient to comply with the city requirements for access. This was not the reason, however, for changing the zoning classification from residential to multiple dwelling. The high cost of utility improvements and land developments coincident to developing this tract for single-family residences was the basis for determining the best use to be multiple-family dwellings. The trial court ordered the rezoning and this court did not pass on this determination. The appeal

was directed to the issue of whether building permits must be issued, once the rezoning had been ordered by the court. We affirmed the lower court's order denying the permits because of inadequate access. Even though the zoning may be unreasonable, the owner, after obtaining favorable action on rezoning, must nevertheless comply with other reasonable requirements before he can develop the property in accordance with the new classification. The factor of access becomes relevant to the reasonableness of zoning classifications only when different access specifications (embodied within the building or subdivision regulations) attach to different zoning classifications.

■ After considering the issue of access in its proper perspective, we turn to the issue of the reasonableness of the Berkeley zoning ordinance as it applies to the Wheeler property. Considering the surrounding uses, the zoning classification on the Wheeler property is not unique or spot zoning. The land to the north is classified and is being utilized as residential property, as it has been since 1928. A residential subdivision is to the west. As to the multiple-family complex to the south, it is beyond the boundaries and control of the Berkeley comprehensive zoning plan. Thus, there is no basis upon which the Wheeler land classification might be held to be zoned differently than other land in the area. To constitute spot zoning, it must receive unique treatment contrary to like property in the same general location. Strandberg v. Kansas City, Mo., 415 S.W. 2d 737, 746[17]; Numer v. Kansas City, Mo.App., 365 S.W.2d 753, 760[5].

Another factor to consider is whether retention of the present zoning classification works a financial hardship on the plaintiffs or causes the value of their property to diminish. Ewing v. City of Springfield, supra, Mo.App., 449 S.W.2d 681 689[16]; Huttig v. City of Richmond Heights, supra, Mo., 372 S.W.2d 833, 840[3]. The evidence establishes that three single-family dwellings may presently be constructed on the property, but, if rezoned, the land would be worthless, unless sold to Lambert Realty. The plaintiffs did not develop the possible effect rezoning would have on the value of other property in the area, and any conclusion about this would be mere speculation.

Finally, we compare the relative gains to the public with the hardship imposed on the plaintiffs by retention of the existing restrictions. The hardship the plaintiffs complain of is their inability to sell the property to Lambert Realty at $6,000.00 per acre. If multiple-family residence was the only possible use they could make of the land, they might have successfully argued their position. They did not develop by their evidence the impossibility of other adequate access. And, more important, they failed to show the value of their land as it is under present zoning. Without this in evidence, it cannot be said that plaintiffs lost anything. A municipality looks to zoning regulations to lessen congestion in the streets, to secure safety from fire, panic and other dangers, to prevent the overcrowding of land, to avoid undue concentrations of population, to facilitate the adequate provisions of water, sewage and other public requirements. Section 89.040, RSMo 1969, V.A.M.S. Defendant's evidence projected the adverse effect a multiple-family complex would have on police and fire protection, traffic congestion and water services. The validity of this evidence can, in the very least, be considered debatable.

Although considering all of plaintiffs' arguments, we fail to find Ordinance No. 1057 of the City of Berkeley, as it applies to their property, either discriminatory, arbitrary, or unreasonable. The ordinance is a proper exercise of the police power delegated to the city by the enabling act (Section 89.010 to Section 89.140, RSMo 1969, V.A.M.S.) and therefore is valid. The judgment is affirmed.

BRADY, C. J., and CLEMENS, J., concur.