242

STATE OF MISSOURI ex rel. J. ARTHUR CHRISTOPHER and CLARA S. CHRISTOPHER, Appellants, v. LUMAN F. MATTHEWS, County Supervisor, TOM DUNN, Councilman First District, JAMES H. McNARY, Councilman Second District, ARTHUR W. SCHMID, Councilman Third District, JAMES A. SINGER, Councilman Fourth District, FRANK L. MARTINI, Councilman Fifth District, HAROLD D. CAREY, Councilman Sixth District, CHARLES R. SKOW, Councilman Seventh District, Respondents, UNION ELECTRIC COMPANY OF MISSOURI, a Corporation, Interpleader, No. 42232—240 S. W. (2d) 934.

Division Two, June 11, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, July 9, 1951.

*Flynn & Parker, Francis C. Flynn* and *Norman C. Parker* for appellants.

*John A. Woodbridge* and *A. E. L. Gardner* for interpleader.

WESTHUES, C.—This is a certiorari proceeding to test the legality of an order changing or modifying the zoning of a particular tract of land located in the southeastern corner of St. Louis County, Missouri, where the Meramec River flows into the Mississippi River. The modification rezoned the land so as to change it from a residential district to a heavy industrial area. The trial court sustained the order of modification and relators appealed.

The writ was issued to the members of the County Court of St. Louis County. After the case was heard in the circuit court and while this appeal was pending, the County of St. Louis adopted a charter. By this charter the County Court was abolished and substituted in its place were a County Supervisor and seven councilmen. Relators, appellants here, filed a motion to substitute the supervisor and seven councilmen as respondents in lieu of the members of the County Court. This motion was sustained.

St. Louis County was zoned under authority of Chapter 64, R. S. 1949. On October 24, 1949, the zoning order previously made was modified under authority of Section 64.140, R. S. 1949. Relators deeming themselves aggrieved by the amending order instituted this proceeding in the Circuit Court of St. Louis County as authorized by subsection 3 of Section 64.120, R. S. 1949. No contention was made that the proceedings amending the zoning order were not in accordance with the law. The contention of relators is that the amending order is illegal, arbitrary, unreasonable, and discriminatory; that the industrial use of the property rezoned will violate the property rights of relators and other persons in the area; that it will constitute a nuisance and a health hazard and lower the property values and thereby deprive relators and others of their property without due process of law in violation of the provisions of the Constitution of Missouri and of the Constitution of the United States. Relators contend that the amendment constituted what is often referred to as "spot zoning."

The County Court filed an answer to relators' petition and the Union Electric Company of Missouri was permitted to and did inter-

plead. The trial court heard the evidence tendered by the parties and sustained the order of the County Court.

 The evidence showed that all of the southeastern portion of St. Louis County was zoned for residence purposes except a small area along the Meramec River which was zoned "resort." The order modifying the original zoning order rezoned for heavy industry about 375 acres of land located in the extreme southeastern corner of the county. This land is low bottom and subject to overflow. The order of modification also rezoned a small strip adjacent to the above tract for light industrial purposes.

The evidence disclosed that the interpleader owned the territory rezoned for heavy industrial purposes; that it is the plan of the interpleader to construct a steam electric generating plant on this property; that one unit is to be erected immediately and when the demand for electric energy cannot be met more units will be added. It is contemplated that eventually four such units will be constructed. It was shown that the location is ideal for such a plant. The Mississippi River to the east of the tract may be utilized for the shipment of coal by barges. The main line of a railroad "runs through this property of the Union Electric." Much water will be needed and an adequate water supply will always be available. In addition to the Mississippi River on the east, the Meramec River runs along the southwestern boundary of the tract. The cost of the plant's four units was estimated to be about $100,000,000 and it will take two and one half years to complete the first unit.. The size of the plant can be gauged by the fact that about 50 tons of coal will be used per hour. Coal being used will cause much fly ash. Ninety-five per cent of this will be collected by precipitators and deposited in basins to be constructed on the surrounding lowlands. The evidence was that the site had many constructional and operational advantages. The site where the plant is to be built will be raised by filling in so the plant will not be molested by floods. The customers to be served are chiefly in St. Louis and St. Louis County. However, as an engineer for the interpleader testified, the plant will be a part of the entire system of the Union Electric Company. So, the energy generated at this plant may be used generally to serve the customers of the Union Electric system.

As to the surrounding territory, the evidence showed the following: Adjacent to the property of the interpleader, the Hillside Investment Company owned about 50 acres of land. This land was above the level of floodwater and was used and rented for public picnic grounds. It was rented to various groups and on certain days as many as 1,000 people would be on the grounds. It was operated on a commercial basis. Relators in this case lived on and owned property on high ground near the Mississippi River about two miles or more north and east of the site of the proposed electric plant. The land in St. Louis County for several miles to the north between the Mississippi and

Meramec Rivers is devoted mostly to farming, principally truck farming. Much of the territory is wooded and hilly. We notice the markings on an exhibit that the lowland along the Meramec River including interpleader's property is about 400 feet above sea level. The land near where the plaintiffs live is marked from 480 to 560 feet above sea level. Relators' evidence showed that about two and a half miles north of the plant is the White House Retreat of the Jesuit Catholic Order. This was established about 1922. From a small beginning it has grown to such proportions that now about 3,000 men of various denominations make retreats there during the year. Improvements including buildings have been erected at a cost of about $650,000. The spiritual director of this establishment testified as follows: ''The White House Retreat, or Retreat House, is an institution which furnishes physical rest and recreation, relaxation and quietude, promoting a better spiritual life in the men who come there. Those who come are given an opportunity to rest and relax under conditions, and in an atmosphere which contributes to complete mental rest and relaxation, an opportunity for contemplation and study of the things contributing to a higher spiritual life; it is a complete change from the kind of life which the business or professional man is accustomed to, and it is open to Catholics and non-Catholics alike, and Jews, and has no racial discrimination. Colored as well as white may come there, and they are open and operate the year round. We have what we call week-end retreats, mid-week retreats, or all-week retreats. We have mid-week retreats which begin Wednesday at noon, about one o'clock, and they end Thursday noon.'' There is also a Boy Scout Camp located along the Meramec River about three and a half miles from the plant site.

Relators also introduced evidence that if the plant is established real estate values will be depreciated in the surrounding territory. Interpleader introduced evidence that the erection of the proposed plant will enhance real estate values in the neighborhood of the plant; that employees at the plant will settle nearby causing an increase in the population; that the annual tax on the first unit of the plant will be about $100,000.

The evidence that the proposed plant will constitute a hazard to health or be detrimental to the surrounding community is not very convincing. Relators mentioned the Boy Scout Camp. Not one witness testified that any detriment would result to the camp. The spiritual director of the White House Retreat was a witness and we quoted from his testimony. However, he did not state the plant would adversely affect the conducting of retreats.

It was in evidence and not disputed that St. Louis County and the City of St. Louis now have a population of over 1,000,000 people; that there is a demand for additional electric energy. The location of the plant with the advantages it has will inure not only to the benefit

of the interpleader but will benefit the customers using electric energy. Rates are to some extent based on the cost of operation. The land upon which the plant is to be erected cannot be profitably used for erection of homes. It is not surprising that the rezoning of the area met with the approval of the Planning Commission, the County Court, and the Circuit Court.

Relators contend the rezoning of the property in question is void because it constituted "spot zoning." The following cases are cited: "Wippler v. Hohn, 341 Mo. 780, 110 S. W. 2d 409; Mueller v. C. Hoffmeister U. & L. Co., 343 Mo. 430, 121 S. W. 2d 775; Guaranty Construction Co. v. Town of Bloomfield, (N. J.) 168 Atl. 34; Michigan-Lake Building Corp. v. Hamilton, 340 Ill. 284, 172 N. E. 710; Clifton Hills Realty Co. v. City of Cincinnati, 60 Ohio App. 443, 21 N. E. 2d 993; Euclid v. Ambler Realty Co., 272 U. S. 365; 8 McQuillin, Municipal Corporations (3rd Ed.) Sections 25.01 and 25.08; Constitution of Missouri, 1945, Section 10, Article I; R. S. Mo. 1949, Section 64.120."

The term "spot zoning" is ordinarily used where a zoning ordinance is amended reclassifying one or more tracts or lots for a use prohibited by the original zoning ordinance. 62 C. J. S. 467, Sec. 226(12) b. Whether an amendment will be held void depends upon the circumstances of each case. Yokley, Zoning Law and Practice, p. 152, Secs. 82, 83. Numerous cases may be found where such amendments have been held to be arbitrary and without sufficient reason and, therefore, void. See Yokley, Zoning Law and Practice, beginning at page 161, Sec. 86. In Wippler v. Hohn, supra, a lot was reclassified to permit the building of a garage in a residential district. The reclassification was held not to be justified. In Mueller v. C. Hoffmeister Undertaking & Livery Co., supra, an amendment to a zoning ordinance which would have permitted the enlargement of a mortuary in a residential district was declared void.

The cases cited by relators from other jurisdictions and also the cases annotated in 128 A. L. R. 740, and 149 A. L. R. 292, cited by relators in their reply brief, are in harmony with the rules announced in the two Missouri cases referred to above.

The amendment in question was made under authority of Sec. 64.140, R. S. 1949. It is conceded that notice of a hearing as required by the law was given and a public hearing was held. Zoning ordinances and amendments thereof are subject to judicial review. The applicable rule is thus stated in Yokley, Zoning Law and Practice, p. 323, Sec. 164: "It is a well settled proposition of zoning law that a court will not substitute its judgment for the judgment of the board. The court may feel that the decision of the board was the best that could have been rendered under the circumstances. It may thoroughly disagree with the reasoning by which the board reached its decision. It may feel that the decision of the board was

248

a substandard piece of logic and thinking. None the less, the court will not set aside the board's view of the matter just to inject its own ideas into the picture of things." In 62 C. J. S. 556 et seq., Sec. 228(1), the following appears: "While municipal zoning and building regulations are a legislative, not a judicial, matter, they are subject to judicial review as to their validity. Thus the courts will review municipal zoning and building ordinances and regulations to determine whether they are a proper exercise of the police power, whether they are reasonable or arbitrary, or discriminatory, or have a substantial relation to the public health, comfort, morals, or welfare. Judicial review is generally limited to validity, and the courts may not substitute their judgment for that of the municipality, or disturb an exercise of the municipality's discretion in zoning matters, unless the discretion is clearly abused." See also State ex rel. Nigro v. Kansas City, 325 Mo. 95, 27 S.. W. 2d 1030, l.c. 1033 (5, 6); Michigan-Lake Bldg. Corporation v. Hamilton, 340 Ill. 284, 172 N. E. 710, l.c. 715 (2-4); Clifton Hills Realty Co. v. City of Cincinnati, 60 Ohio App. 443, 21 N. E. 2d 993, l.c. 997 (6, 7).

The rezoning under consideration cannot be said to have been done, as relators contend, for the sole benefit of the interpleader. The Union Electric Company furnishes electric energy to the general public. It is a public service corporation subject to regulations as such. It must furnish and sell its product to the general public. There must be electric generating plants. The land acquired by it and rezoned for heavy industry was shown to be unfit for any other purpose because of floodwaters. However, the location was ideal for the construction of the plant in question. The surrounding territory consists in the main of wooded lands and small truck farms.

In the circumstances we cannot hold that the amendment to the ordinance was unreasonable nor that any of relators' legal rights was violated.

We rule that the rezoning effected by the amendment in question does not constitute "spot zoning" within the class condemned by the authorities cited supra. Higbee v. Chicago, B. & Q. R. Co., 292 N. W. (Wis.) 320, 128 A. L. R. 734; Schell v. Kansas City, 360 Mo. 27, 226 S. W. 2d 718.

The judgment of the circuit court is hereby affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.