**CITY OF LAKE LOTAWANA, a Municipal Corporation, et al., Appellants,**

v.

**George W. LEHR et al., Respondents.**

**No. KCD 27038.**

Missouri Court of Appeals, Kansas City District.

Sept. 2, 1975.

Motion for Rehearing and/or Transfer Denied Oct. 6, 1975.

Application to Transfer Denied Dec. 8, 1975.

Harry P. Thomson, Jr., John R. Caslavka, Jack L. Campbell, Paul Crider, Jr., Kansas City, for appellants.

Stanley Christopher, County Counselor, Wm. D. Cosgrove, Special County Counselor, Kansas City, for respondents George W. Lehr, and others.

Max W. Foust, Duke W. Ponick, Jr., Morris, Foust, Moudy & Beckett, Kansas City, for respondent Tri-Shel Enterprises.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

WASSERSTROM, Presiding Judge.

From the grant of a special use permit by the Jackson County Board of Zoning Adjustment, the opponents filed a petition for review in the Circuit Court. That court affirmed the administrative agency action, and the opponents appeal now to this court.

Tri-Shel, a joint venture, initiated these proceedings by filing three related applications. The first of these, application R–237, sought a rezoning of approximately 1677 acres in eastern Jackson County from District D Agricultural, to reclassify 1375 acres to District A First Dwelling House, while 156 acres would be rezoned to Districts B and C for multi-family housing, and 146 acres would be rezoned to District F General Business. The second application, S–267, sought a special permit for the construction and use of a golf course on 493 acres. The third application, S–266, sought a special permit to remove limestone by mining from below the surface of a portion of the total acreage and to use the resultant subsurface space for the purpose of underground commercial storage and offices.

Hearings, as required by the Jackson County Zoning Order, were held on all three applications before the County Planning Commission. Extensive evidence was given in support of these applications by the applicant's "Development Team" consisting of Ralph H. Ochsner, a professional city and urban planner, who served as the planning and development co-ordinator; Elmer M. Miller, a professional engineer who was charged with development of water supply and sewers for the project; David E. Lovelace, charged with planning for development of the golf course; James J. Scott, a mining engineer whose function pertained to the contemplated underground rock mining; Donald M. Duncan, a professional engineer who specialized in soil and foundations; and Harold L. Fridkin, charged with the legal and organizational duties. This Development Team testified generally that the applicant proposed to create a three dimensional project. On the surface, the development would consist of single family and multi-family housing, a golf course, and a shopping center. The ultimate housing potential was projected as a total of 10,900 dwelling units. Underground, the initial stage of development would consist of removal of Bethany Falls Limestone exclusively by underground mining, using what Scott described as the rib and pillar method. The mine would have an entrance which would not be visible from the road. A distinctive feature of the proposed plan prohibits any mining unless there is a minimum of 30 feet of upper formation rock cover. After sufficient underground space has been developed by removal of rock, the rental of underground space would be undertaken concurrently with further mining. The underground area would provide space not only for storage and offices, but also for underground parking and subsurface roadways.

These witnesses further testified that the total investment projected for the entire development would be approximately $300–500,000,000. Financing had been arranged prior to the time of hearing before the Planning Commission, but all plans contemplated the availability of substantial cash flow from the underground development which would commence somewhat prior in time to the surface development, with both thereafter continuing concurrently. Testimony on behalf of the applicant was that approximately 750,000 to 1,000,000 tons of rock could be removed annually for an eventual total income of $50–70,000,000 from the sale of rock; rental of underground space was projected to produce an additional total of $50–60,000,000.

Extensive opposition testimony and petitions were presented by the City of Lake Lotawana which is located in close proximity to the proposed project, by the Lake Lotawana Association and by numerous residents both of Lake Lotawana and other properties close by. The opposition was

premised upon fears of blast damage from explosives to be used during the course of mining, increase in noise, production of dust, water pollution, increased traffic, and loss of the residential and recreational character of the area. The opponents testified as to the fine quality of existing homes, with value up to $225,000. The opponents also offered the testimony of real estate appraisers who testified that the operation of a rock quarry, whether or not underground, would result in blighting the value of neighboring residential property.

At the close of the evidence heard by it, the Planning Commission recommended approval of S–267, having to do with the golf course; recommended a change of zoning, but to an extent considerably different from that requested in R–237; and recommended denial of S–266 pertaining to the mining and underground development.

The hearing by the County Court on rezoning application R–237 was held just prior to the effective date upon which the new Jackson County Legislature was to come into existence, and concurrently the County Board of Zoning Adjustment (consisting of the same membership as the County Court) took up for consideration the other two applications. These members sitting as the County Court approved rezoning application R–237 as requested with minor modifications not here in question. Then, sitting as the Board of Zoning Adjustment, these members granted by a majority vote special use permit S–266 for a period of 50 years, although the permit as granted provided permission only to operate a quarry and made no mention of underground storage or underground offices which had been requested in the application. The Board also approved unanimously application S–267 pertaining to the golf course.

In the Circuit Court, no issue was raised as to anything other than the grant of the S–266 special use permit. As to that, the Circuit Court approved the action of the Board of Zoning Adjustment, pursuant to a finding that the Board's order "is supported by competent and substantial evidence upon the whole record and the Court is satisfied that the Board did not abuse its discretion nor act in an arbitrary or capricious manner in granting the permit."

I.

■ On this appeal, the first point raised by the opponents to Special Use Permit S–266 is a claim that the Board order was void because it in effect granted spot zoning. This point fails because it mistakes the nature of the rule prohibiting spot zoning. Spot zoning occurs when the legislative body undertakes to amend zoning classification so as to give special and undeserved preference to one small tract which is different from that given to neighboring like property. As stated in *State ex rel. Christopher v. Matthews*, 362 Mo. 242, 240 S.W.2d 934, 937 (1951):

> "The term 'spot zoning' is ordinarily used where a zoning ordinance is amended reclassifying one or more tracts or lots for a use prohibited by the original zoning ordinance."

■ No amendment to an existing zoning ordinance is involved here, nor is there any reclassification which could be considered as an indirect attempt to rezone. Rather, the action taken by the Board of Zoning Adjustment was merely the exercise of an administrative discretion expressly granted to it by the enabling act and the zoning ordinance. *State ex rel. Manchester Improvement Co. v. City of Winchester*, 400 S.W.2d 47, 48 (Mo.1966). Section 64.281–3 of the statute (all statutory references in this opinion being to RSMo 1969) authorized the county to adopt regulations for the granting of special uses in a specific district or districts because of the peculiar nature of the uses, and in this connection the statute states that the use shall be permitted by a special permit "as a permissive use and *not as a rezoning.*" (Emphasis added).

Pursuant to that authority, Jackson County did provide in Section 16 of its Zoning Order for special uses, one classifi-

cation being for "[q]uarries, mines, sand or gravel pits or excavations, for the purpose of removing, screening, crushing, washing or storage of ore, clay, stone, gravel or similar materials." The grant of such a special permit is subject to certain special requirements. However, the grant of a special permit is clearly authorized by statutory authority if the requirements are met and the issuance under those circumstances cannot possibly be a departure from the original legislative scheme so as to constitute a "reclassification" within the meaning of the spot zoning prohibition. The only question legitimately for consideration is whether the special requirements of Section 16 have been met. This is the subject of the next points on appeal about to be discussed.

## II.

The opponents' second point is that the applicant has not met the requirement of Section 16 of the Zoning Order "that the proposed use will not injure the appropriate use of the neighboring property." This point misquotes the requirement of Section 16, which actually is that the special use must not in the judgment of the Board "seriously" injure the appropriate use of neighboring property. Disregarding this misquotation and applying the correct standard, the record shows a compliance with the requirement in question.

The Board found that the issuance of Special Permit S–266 "will not seriously injure the appropriate use of neighboring property, and will conform to and is within the scope, intent and purpose of the Zoning Order of Jackson County, Missouri." The parties agree that the only question now properly to be considered with respect to this matter is whether that finding is supported by competent and substantial evidence.

The opponents claim that the Board's findings are not so supported. To test the validity of that claim, a review becomes necessary of the evidence bearing on the various factors of claimed injury.

1. *Dust.* Mining engineer Scott testified that dust from blasting would be "contained almost in total within the mine." Micro-sized particles, invisible to the naked eye, would be emitted from the air shafts but would pose no problem to Lake Lotawana residents, since much more dust comes from their roads. No pollution would come from the air shafts.

A surface crusher will be located on the site, but it will be enclosed and designed so that it will not be unsightly nor create any dust problem. No asphalt nor concrete plant will be at the site, but instead the crushed limestone will be hauled elsewhere for processing. All haul roads will be hard surfaced and the truck loads will receive treatment.

■ The only evidence introduced by opponents having to do with this subject related to existing quarries which were developed and are being operated on a basis different from the one described by applicant's experts. On the basis of all the evidence, the Board could reasonably conclude that this project will not generate dust to the extent of seriously injuring use of the neighboring property.

2. *Vibrations from Blasting and Mining.* The effects on the land directly to the north and west of the mining area call for primary attention, since the land to the south and east is part of the 1677 acre tract owned by applicant. The mine will have only a half-mile radius from the entrance, and no neighbor has a residence within this half-mile range. The nearest residence on Milton Thompson Road is 500' from applicant's property line. Because of inadequate surface rock coverage, mining all the way up to the property line is not anticipated. The contemplated mine face would be 1000' or more away from any existing residence. The permit as granted prohibits blasting within 500' of the boundary line, so that all blasting will be at least 1000' away from any existing residence on neighboring property.

Geophysicist Rechtien stated the property 500' away from the blast would feel "a ground displacement * * * equivalent to a thickness of the human hair." Tests conducted at the site indicated that an instrument would not record any vibrations 1000' away. An underground blast of that distance would be neither felt nor heard and such blasts would pose "absolutely no danger to existing structures" or to future structures. Scott added on this subject that 99% of the time landowners within 500–1000' of the property line would not hear or feel the "thump" of air displacement from blasting; the 1% possibility occurs only with an unusual weather condition, temperature inversion. Blasting during such a weather condition is prohibited under the special use permit.

Ochsner, applicant's chief planner, testified that a fairly high noise level exists at a crusher site, but would be of no real concern a half-mile away. The noise, however, would concern applicant itself and for that reason the crushing equipment will be housed and electric rather than diesel motors will be used.

■ The opponents offered no affirmative evidence to show adverse effects to them from blasting or noise. The Board was justified on the whole record in concluding that there was no serious injury threatened to the opponents from this source.

3. *Water Pollution and Sewage.* Civil engineer Miller testified that water run-off into Lake Lotawana can be controlled. State law prohibits seepage or effluents from sewage plants from entering a lake, and requires a three-cell lagoon, standby power generators or holding reservoirs, and silt control. Miller testified that everything would be done necessary to conform to those State regulations.

Scott also testified that there would be no water problem from operation of the mine. The entrance is on a downward incline into the mine so that any underground water, drill water or dust pressure water will be trapped in the mine. This makes a naturally controlled system insuring that no effluent is put into the stream system and that there is no gravity run-off. Water developed in the mine space through processing or seepage will be pumped to temporary silt catchment basins and water coming toward the mine entrance will be drained into the proposed lake. Some overflow from the lake into Lake Lotawana may occur with a heavy rainfall, but the water coming out of the mine would be clear and nonpolluting.

Applicant will pay for the sewer system that is to by-pass Lake Lotawana.

■ The opponents offered no affirmative evidence showing that the proposed project will create water pollution or sewage danger. The Board was justified in concluding that there was no serious injury threatened to the opponents from this source.

4. *Traffic.* Ochsner testified that initially about 277 truck trips per day would be made (including both loaded and empty, returning, trucks) and that at maximum production about 554 trips would be made, with the average being 416 trips, 52 per hour if made over an 8-hour day. Based on these figures, the trucks would utilize 2% of the existing traffic capacity if they made all trips during one 8-hour period and used only Highway 7; this will decline to 1% if and when they use Highway 50. Ochsner concluded that "the addition of the truck traffic does not represent any particular problem" in terms of total traffic capacity.

As for operational problems at intersections, applicant agrees to install acceleration lanes, left-turn lanes, traffic devices, whatever may be reasonably required, at its own expense. This is incorporated as a condition of the permit granted. Applicant would agree to controls involving times of truck traffic, routing, speed and weight.

The opponents introduced no evidence to the contrary, other than their reliance upon a factor allegedly shown by State Highway

Department traffic statistics. Opponents state in their brief that "truck traffic generated from the opening of the mine would triple the existing traffic on Highway 7." That statement is inaccurate. The projected mine traffic would triple the existing *truck* traffic, raising the "less than 250" trucks per day by, on the average, 416, for a total of 666 trucks per day.

■ Based upon the record as a whole, the Board was justified in its conclusion that no serious injury to neighboring property would threaten by reason of increased traffic.

5. *Land Values.* This is the issue to which the great bulk of the opponents' testimony was directed and on which their argument in this court is concentrated. They produced at the administrative hearings a number of real estate brokers, appraisers and developers who testified that people just do not want to buy land around rock quarries, that generally no market exists for houses built on the surface of an area later undermined, that it would be hard to sell houses built within the 1677 acre tract, that rock quarries generally depress the value of adjacent property, that applicant's mine would have a detrimental effect on existing property values, that the mine would be a "blight" on the area and that the proposed golf course and lake would help increase land values, but would not off-set the negative psychological impact of a rock quarry.

■ The weight to be given opinion evidence is for the trier of fact, and the Board, which was the trier of the facts here, was not bound to accept the above testimony. *Conner v. Herd,* 452 S.W.2d 272 (Mo.App.1970). That testimony was subject to at least some discount, in view of the admission by one of the opponents' experts to the effect that "there is just no way as far as I am concerned to determine [the percentage by which neighboring property value will be depressed] because there has never been a rock quarry put in on a piece of ground like this in Jackson County * * there is no experience to evaluate it on."

■ Moreover, the testimony given by the opponents' witnesses was directly contradicted by Ochsner who testified: "[w]e don't concede that there will be any decrease in values and obviously if they should act favorably upon our request we will be increasing their values." Ochsner's testimony alone constituted competent and substantial evidence to support the Board's conclusion that there would be no serious injury to the opponents from loss of land value. Even if the opponents have introduced substantial and competent evidence to the contrary, that would afford no basis for invalidating the Board's action. The test is whether the Board's finding is supported by competent and substantial evidence; if it is, then the substantiality of contrary evidence is immaterial. *Hanebrink v. Parker,* 506 S.W.2d 455, 458 (Mo. App.1974).

■ After considering all of the evidence, the Board specifically found that the proposed use will not seriously injure the appropriate use of neighboring property. After reviewing the record, the trial court found the Board's order "is supported by competent and substantial evidence upon the whole record." The review of the record by this court produces the same conclusion.

III.

The opponents argue next that the Board exceeded its jurisdiction in granting permission for use of the underground area for office and storage space. They point out that Section 16 of the Zoning Order authorizes special permits for only 22 specified uses and that storage and offices are not covered within those 22 specifications. The trouble with this argument is that the Board has not authorized storage or offices in the underground space. Although the application did request permission for these additional uses, the permit granted limited

the use permission simply "to operate a quarry."

True enough, the permit requires as a condition the implementation of the plans, specifications and provisions of the Site Evaluation and the Operating Plan filed by applicant. The Operating Plan does provide for the ultimate development of the underground space for storage and offices, and applicant's evidence emphasized that this secondary use constitutes an important and inseparable part of the whole plan. However, this secondary use obviously cannot be made until the underground space is produced by the removal of rock, and the Operation Plan states that the underground space will be opened for secondary usage at a rate of approximately 32 acres per year. The Plan further states "it is anticipated that building use of developed [underground] space can commence within five years of the initial mining sequence."

Study of the Board's order makes it quite clear that it does not currently authorize any subsurface use other than removal of rock. When the applicant approaches the time when it is ready to begin rentals of underground space, which is estimated to be at least five years after commencement of mining, then applicant will have to apply for some further permission to engage in the storage and office operation. This interpretation of the Board's order is directly supported by a colloquy between one of the opponents and Judge Bolger during the course of the hearing before the Board:

"MR. COOLEY: I am Bob Cooley. I am a lot owner at Lake Lotawana. I would like to direct this question to the proponents on this. It sounds like, to me, that it is kind of a secondary issue in this thing. They are not only asking the Zoning Board for zoning for a rock quarry here, but obviously, the intention of this is to derive an industrial park there, too, underground. Is this the intent of this? In other words, we are not only going to have the rock quarry, but ten years from now we will have an industrial park.

"JUDGE BOLGER: The zoning as requested by Tri-Shell [sic] and Mr. Counselor, correct me if I am wrong, certainly would not permit industry as requested by the applicant. Am I correct?

"MR. LAMBERT: That is correct.

"MR. COSGROVE: Right.

"JUDGE BOLGER: In other words, it would appear to me as though that if S–266 was recommended favorably by this body, then at a later point in time—I have no idea when, ten years, or fifty years from now—that these applicants or others then would perhaps be coming in and asking for this proposed industrial zoning. This was not being considered."

■ The present permit, No. S–266, in no way authorizes, directly or by implication, the use of the underground space for anything other than removal of rock.

IV.

For their next point the opponents contend that the grant of this special use permit under Section 16 of the Zoning Order is beyond the authority granted under the enabling act, § 64.281–3. That statutory section provides that counties may adopt regulations for special uses which cannot be generally permitted in a specific district or districts because of the peculiar nature of the uses. The statute goes on that "[t]he uses shall be limited to those which, if placed, specified or generally permitted in a specific district or districts, would pose undue regulatory difficulties."

The opponents point out that Section 15 of the Zoning Order establishes District H Heavy Industrial District in which there is permitted generally "Stone quarries, rock crushers." They proceed to argue that the listing of a stone quarry as a general use permitted in District H demonstrates that a general use can be generally permitted "without posing any undue regulatory difficulty" and that this, therefore, bars the same use as being the subject of a special permit.

The conclusion sought by the opponents does not follow from its premises. It must be noted that § 64.281 contemplates that any given special use may be permitted in "a specific district *or districts*." The inclusion of quarry use in District H therefore did not exhaust the zoning power of the county. It still retained the further right to also permit quarrying in one or more other districts. While the Jackson County Court found that there was no undue regulatory difficulties in allowing quarrying in District H Heavy Industrial District, that did not at all signify that there might not be undue regulatory difficulties in allowing that same use in districts designated generally for higher uses. There is no inconsistency in the County Court's determination that quarrying can be permitted generally in District H without regulatory problems, but that such problems do exist in permitting that use in other districts. It is therefore entirely appropriate to provide for the general quarrying use in District H and at the same time to provide for special permits to conduct that use in other districts.

## V.

The opponents argue next that the Board was without jurisdiction to grant the permit because the applicant is not a legal entity capable of holding title to real estate and had no interest in the 1677 acres affected. The first part of this argument, based on an alleged legal incapacity by applicant to hold title, is mistaken. Section 358.080–3 provides that "[a]ny estate in real property may be acquired in the partnership name." The effect of this statute is recognized as applying to a joint venture, which is not essentially different in character from a partnership, in *Grissum v. Reesman*, 505 S.W.2d 81, 87 (Mo.1974).

The factual part of their argument, that there is no direct proof that applicant actually held title, is also mistaken. They argue that a direct statement as to applicant's ownership by applicant's counsel at the commencement of the Board hearing should not be accepted as proof, on the theory that a statement by counsel is not evidence. However, like evidence in the form of sworn testimony was given by applicant's witness Ochsner. Moreover, in addition to Ochsner's testimony there are repeated references throughout the record to facts and actions which are consistent only with the applicant being the owner of the 1677 acres in question. In *Tramonti v. Zoning Board of Review of Cranston*, 93 R.I. 131, 172 A.2d 93, 95 (1961), a lack of formal proof of ownership by the applicant was held not to be fatal, on the ground that the transcript was replete with evidence of conduct consistent only with ownership. Exactly the same thing is true here.

The opponents further argue that the record does not show whether title is in the name of the applicant as a joint venture or whether it is in the individual names of the two joint venturers. It is wholly immaterial which of those two situations is actually true. Section 358.100 provides that title to partnership real estate may be held by the partnership either in its own partnership name or in the individual names of one or more or all of the partners.

## VI.

For their final point, the opponents say that the order fails to adequately regulate and restrict the operation of the proposed mine. Section 16 of the Zoning Order does require that a special use permit "shall set out regulations, restrictions, limitations and termination date so that reasonable control may be exercised over said uses." The order issued here by the County Board did comply with this quoted requirement. Special Use Permit S–266 sets out restrictions, as follows:

> "This special permit is and shall be subject to the following regulations, restrictions and limitations are [as] hereinafter set out and are provisions adopted as conditions for this permit:

(a) There shall be no blasting within 500 feet of the boundary line as described in the legal description set out in this order.

(b) Blasting shall be conducted so that no concussion is perceptible to adjoining, abutting and opposite property owners; seismograph reports shall be submitted to the Planning Director monthly and the daily blasting schedule and seismograph reports shall be available for inspection by the Planning Director.

(c) No blasting shall be conducted when the atmospheric conditions are such that sound or shock waves are easily conducted or transmitted, such as occur when there is a condition commonly known as a temperature inversion.

(d) Signalization, traffic controls and additional traffic lanes as may be reasonably required by the County shall be installed and constructed at the cost of applicant.

(e) That applicant shall file an annual status report with the Planning Director concerning all surface and subsurface development and plans for development, to enable the Director to determine if applicant is in compliance with restrictions, regulations and limitations of this Order and to insure the orderly development of the surface and sub-surface within the comprehensive plan as submitted by applicant.

(f) The quarrying operation shall be conducted in compliance with all existing federal, state and local laws and regulations affecting pollution of air and water.

(g) That the granting of this permit is further subject to the implementation of the plans, specifications and provisions of the Site Evaluation and Operating Plan filed by applicant and it is hereby made a part hereof as though set out in its entirety."

These restrictions are comprehensive and specific. An annual report is required of the applicant to enable the zoning authorities to determine that the applicant has remained in compliance and to insure "the orderly development of the surface and sub-surface within the comprehensive plan as submitted by applicant." This latter requirement must be understood as including not only the Site Evaluation and Operating Plan, but also all of the representations and promises made by applicant's Development Team in the administrative hearing. The zoning authorities have adequate power to enforce these restrictions. All of the opponents' objections to the adequacy of these restrictions have been considered in detail and are found to be without merit.

Affirmed.

All concur.